FILED

AUG 3 0 2011

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

1
2  Thomas C. Horne
   Attorney General
   (Firm State Bar No. 14000)
3  Eric J. Bistrow
   Chief Deputy Attorney General
4  State Bar No. 002345
   David R. Cole
5  Arizona Solicitor General
   State Bar No. 004643
6  James E. Barton II
   Assistant Attorney General
7  State Bar No. 023888
   Office of the Attorney General
8  1275 West Washington Street
   Phoenix, AZ 85007-2926
9  Telephone: (602) 542-8305
   Facsimile: (602) 542-8308
10 solicitorgeneral@azag.gov

11 Attorneys for Plaintiff

12              **IN THE UNITED STATES DISTRICT COURT**

13              **FOR THE DISTRICT OF COLUMBIA**

14 STATE OF ARIZONA
        1275 West Washington
15      Phoenix, Arizona 85007,

16                                          Case: 1:11-cv-01559
                                            Assigned To : Jackson, Amy Berman
                Plaintiff,                  Assign. Date : 8/30/2011
17                                          Description: 3-Judge Court

18 vs.                                      **COMPLAINT FOR**
   ERIC H. HOLDER, JR., Attorney General of **DECLARATORY JUDGMENT**
19 the United States of America, in his Official **AND INJUNCTIVE RELIEF**
   Capacity,
20      U.S. Department of Justice
        950 Pennsylvania Avenue, N.W.
21      Washington, D.C. 20530-0001

22
                Defendant.
23

24      The State of Arizona, through undersigned counsel, brings this civil action for declaratory

25 judgment that §§ 4 and 5 of the Voting Rights Act of 1965, as amended in 2006 (the "VRA" or

   the "Act") are unconstitutional and seeks injunctive relief preventing enforcement of these
26
   sections of the Act and alleges as follows:

1

# I.    THE PARTIES

1.  Defendant Eric H. Holder, Jr. is the Attorney General of the United States of America ("U.S. Attorney General") and, as head of United States Department of Justice ("DOJ"), has responsibilities including but not limited to enforcing the VRA.  The U.S. Attorney General is sued in his official capacity.

2.  The State of Arizona is a sovereign state within the United States of America.

# II.    JURISDICTION AND VENUE

3.  This Court has jurisdiction under Article III of the Constitution of the United States and pursuant to 28 U.S.C. § 1331 because the matters in controversy arise under the VRA and the Tenth, Fourteenth, and Fifteenth Amendments of the Constitution and present a federal question.

4.  This Court also has jurisdiction pursuant to 28 U.S.C. § 1346 because an officer of the United States is the Defendant.

5.  Plaintiff is seeking relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202.

6.  Venue lies in the District Court for the District of Columbia pursuant to 42 U.S.C. § 1973l(b)

# III.    THREE JUDGE PANEL

7.  Pursuant to 28 U.S.C. § 2284 and 42 U.S.C. § 1973c(a), Plaintiff requests appointment of a three-judge Court to hear and resolve this Complaint.

# IV.    DECLARATORY JUDGMENT

8.  There is an actual controversy of sufficient immediacy and concreteness relating to the legal rights and duties of the Plaintiff and its legal relationship with the Defendant to warrant relief under 28 U.S.C. §§ 2201, 2202.

9.   The harm to the Plaintiff and political subdivisions within its territorial boundaries as a direct result of the actions and threatened actions of the Defendant is sufficiently real and imminent to warrant the issuance of a conclusive declaratory judgment and related injunctive relief.

## V.    BACKGROUND

### SENATE BILL 1205

**10.**    S.B. 1205 permits the dissolutions of school districts that have no students (transportation districts) and their annexation to joining districts.  Under the laws challenged here, a statute as innocuous as this has to go through an approval process with the Justice Department.  Such laws cannot be justified by any power delegated to the federal government by the Constitution.  Further, Arizona does now and has always supported full and open voting rights for all residents and submission to §5 preclearance procedures is not only unnecessary but also unconstitutional.

### THE VOTING RIGHTS ACT

11.    Congress enacted the VRA to enforce the Fifteenth Amendment.  Pub. L. No. 89-110, 79 Stat. 437 (1965); U.S. Const., amend. XV § 2.

12.    Section 2 of the Act made it a violation of federal law for any state or municipality to put in place a "standard, practice or procedure" that denies or abridges the right of United States citizens to vote based on race or color.  Pub. L. No. 89-110, 79 Stat. 437 (1965).

13.    The remainder of the Act is, as described by the Unites States Supreme Court, a "scheme of stringent remedies aimed at areas where voting discrimination has been most flagrant." *South Carolina v. Katzenbach*, 383 U.S. 301, 315 (1966).

14.    Section 4 established the factual test to determine which states or political subdivisions within a state were covered by the scheme of stringent remedies.  It included all states and political subdivisions where (A) a test or device was used as a prerequisite for voting and (B) less than fifty-percent of voting age residents voted in the 1964 presidential election. Voting Rights Act, Pub. L. 89-110, Title I, § 4, 79 Stat. 438-39 (1965).

15.     Section 5 of the VRA was passed as a temporary, five-year measure requiring covered jurisdictions to obtain preclearance for all changes to election laws and regulations. Voting Rights Act, Pub. L. 89-110, Title I, § 5, 79 Stat. 438-39 (1965).  As set forth below, Arizona has been made subject to these preclearance requirements for over 35 years.

16.     Arizona's Apache, Coconino, Navajo, and Yuma counties were initially covered under the 1965 VRA preclearance formula.[1]  Within one year, however, Apache, Coconino, and Navajo counties successfully bailed out of coverage after obtaining the permission of both the U.S. Attorney General and the D.C. District Court.  *Apache County v. United States*, 256 F. Supp. 903, 906, 910 (D.D.C. 1966).

17.     After a five-year renewal, the VRA's preclearance provisions were due to expire in 1975.  The United States Commission on Civil Rights compiled information on voting practices in covered jurisdictions and recommended that Congress (1) renew all expiring provisions for ten years and (2) expand the Act to protect "language minorities."[2]  Congress, pursuant to this recommendation, enacted the 1975 Voting Rights Act.[3]  The 1975 VRA sought to protect "language minorities" by requiring "covered jurisdictions" to be subject to prescribed preclearance procedures of the Justice Department before a new voting law and/or qualification could be adopted or implemented.  The purpose of this law was to prevent covered jurisdictions from replacing discriminatory and invalid voting laws with new discriminatory enactments.

18.     Section 4 of the 1975 VRA caused any state for "which (i) the Attorney General determine[d] maintained on November 1, 1972, any test or device, and with respect to which (ii) the Director of the Census determine[d] that less than 50 per centum of the citizens of voting age

---

[1] Determination of the Director of the Census Pursuant to § 4(b)(2) of the Voting Rights Act of 1965, 30 Fed. Reg. 9897 (1965) (Apache); Determination of the Director Pursuant to § 4(b)(2) of the Voting Rights Act of 1965, 30 Fed. Reg. 14505 (Coconino & Navajo); Determination of the Director Regarding Voting Rights, 31 Fed. Reg. 982 (1966) (Yuma).

[2] United States Commission on Civil Rights, The Voting Rights Act:  Ten Years After 344-56 (1975).  This report ("Ten Years After"), was relied on by Congress in drafting the Voting Rights Act of 1975 ("1975 VRA").  See S. Rep. No. 94-295 (1975).

[3] 42 U.S.C. 1973, et. seq.

-4-

were registered on November 1, 1972, or that less than 50 per centum of such persons voted in the Presidential election of November 1972" to be a covered jurisdiction. 42 U.S.C. § 1973b(b). Section 4 of the 1975 VRA also defined "test or device" as used in the first criterion to include "any practice or requirement by which any State or political subdivision provided any registration or voting notices, forms, instructions, assistance, or other materials or information relating to the electoral process, including ballots, only in the English language, where the Director of the Census determines that more than five per centum of the citizens of voting age residing in such State or political subdivision are members of a single language minority." 42 U.S.C. § 1973b(f)(3). Arizona implemented bilingual voting in 1974, a year before the Act was passed, but after the arbitrary 1972 cutoff date.

19. Pursuant to the 1975 VRA, the U.S. Attorney General and the Director of the Bureau of the Census determined that under §§ 4(b) and 4(f)(3) of the Act, Arizona was a covered jurisdiction. The basis for this determination rested on the significant Hispanic population of the State and the fact that in 1972, English "only" voting materials were used.

20. To determine members of a "single language minority group," Congress relied on the definition of "Spanish heritage" used by the Bureau of Census in the 1970 census. S. Rep. No. 94-295 n.14 (1975) (summarizing definition); H.R. Rep. 94-196 n.16 (1975) (same). The formula for whether a state met the 5% threshold for persons of "Spanish heritage" was calculated in three different ways for three different groups of states, as shown in the following chart:

|  | A | B | C |
|---|---|---|---|
|  | "Spanish language" defined as: "persons of Spanish mother tongue and all other persons in families in which the head or wife reported Spanish as his or her mother tongue" | "Spanish surname" defined as: "a list of over 8,000 Spanish surnames originally complied by the Immigration and Naturalization Service (and later updated by the Bureau of Census)" | "Puerto Rican birth or parentage" defined as: "persons born in Puerto Rico and persons born in the United States or an outlying area with one or both parents born in Puerto Rico" |
| 42 States and the District of Columbia | Included | - | - |
| Arizona, California, Colorado, New Mexico, and Texas | Included | Included | - |
| New Jersey, New York, and Pennsylvania | - | - | Included |
| Source: U.S. Department of Commerce, Bureau of the Census, 1970 Census of Population, Vol. I Characteristics of the Population, Pt. 1 United States Summary, §2, Appendix B App-17 to -18 (Issued June 1973), attached as Exhibit C. | | | |

Using the foregoing chart, Arizona was deemed to be a covered state because at least 5% of the population fell within the A and B columns set forth above.

21.    Just because a person claims that Spanish is his mother tongue does not mean that he cannot speak or read English or that he suffers from discrimination. The same is true of those with a Spanish surname. There is no basis to claim that a person with a Hispanic surname cannot read or speak English or suffers from discrimination. The entire classification system is flawed, arbitrary, and irrational. No explanation was given as to why persons with a "Spanish surname" (but who did not speak Spanish as their native language) would encounter discrimination in Denver but not Las Vegas or Orlando; why a person who did not speak Spanish but had one Puerto Rican parent would face discrimination in Erie but not Stamford or Chicago; or why persons who spoke Spanish as their native language and did not have "Puerto Rican birth or parentage" faced discrimination only in the forty-seven states not named New

Jersey, New York, or Pennsylvania.

22.    The definitions of "Spanish language" and "Puerto Rican birth or parentage" included white English speakers raised in the United States within the calculation of "language minorities" if they married a native Spanish speaker or were born to vacationers in Puerto Rico. As such, a white English speaker would be classified as a "language minority" upon marriage to a Spanish speaker in Baltimore but not when the couple moved to Atlantic City, and a non-Hispanic English speaker born to vacationers in Puerto Rico would be classified as a "language minority" while residing in Pittsburg but not upon moving to Cleveland.

23.    In addition to the irrational and arbitrary classification system described above, the 1972 trigger date set forth in the 1975 VRA was also irrational and arbitrary.  By 1974, Arizona had switched to a bilingual election system, which included ballots, voting machine forms, and voting machine instructions in both Spanish and English.  *See* Extension of the Voting Rights Act of 1965: Hearing Before the S. Subcomm. on Constitutional Rights of the Comm. on the Judiciary, 94th Cong. (April 30, 1975) (Testimony of Hon. Barry Goldwater, A U.S. Senator From the State of Arizona).  Consequently, at the time of the enactment of the 1975 VRA, Arizona had in place an electoral system that was designed to ensure that all of its citizens, including Hispanics who only spoke limited English, could effectively exercise their right to vote and engage in the electoral process to the same degree as other citizens.

24.    In 1974, Arizona elected Raul Castro, as governor.  In doing so, Arizona became only the second state in the nation to popularly elect a Hispanic governor.  National Governors Association, *Governors Database,* http://nga.org/portal/site/nga/menuitem.216bea7c618ef3f8a278110501010a0/ (search Race as "Hispanic") (last accessed June 3, 2011).

25.    Congress passed twenty-five year reauthorizations of the 1975 VRA preclearance provision in 1982 ("1982 VRA") and 2006 ("2006 VRA") respectively.

26.    In 2006, Congress recognized that "significant progress" had been made in addressing the concerns that originally justified the VRA and cited "increased numbers of

registered minority voters, minority voter turnout, and minority representation." *See* Fannie Lou Hamer, Rosa Parks, and Coretta Scott King Voting Rights Act Reauthorization and Amendments Act of 2006, H.R. 9, 109th Cong. § 2(b)(1) (2006).

27.     Nevertheless, the 2006 VRA left the 1975 formula for §5 coverage essentially unchanged when extending the Act in order to combat "second generation barriers" such as "racially polarized voting." *Id.* at § 2(b)(2)-(3). "Racially polarized voting" is not an indicator of discrimination.

28.     The 2006 VRA also amended §5 by adding subsections (b) to (d). Pub. L. 109-246, § 5(3). These additions allow the U.S. Attorney General to interpose an objection to a change in voting, as broadly defined by the Act, if the change would diminish "the ability of any citizens of the United States on account of race or color . . . to elect their preferred candidates of choice," and makes it clear that discriminatory purpose includes any discriminatory purpose. *Id.*

29.     In reauthorizing §5 in 2006, Congress failed to specifically identify evidence of continuing discrimination in covered jurisdictions such as Arizona. Indeed, when the 1975 VRA was enacted, the conditions that caused Arizona and its political subdivisions to be covered by §5 no longer existed, and did not even exist when the 1975 Act was passed. Those conditions have not existed since 1974.

30.     Congress defied the Supreme Court's admonishment that such extensive meddling would "exacerbate the 'substantial' federalism costs that the preclearance procedure already exacts, perhaps to the extent of raising concerns about §5's constitutionality." H.R. Rep. No. 109-478 (2006) (quoting with disagreement *Reno v. Bossier Parish*, 528 U.S. 320, 336 (2000)).

## BURDENS ON ARIZONA

31.     Arizona has now been subject to the burdens of the preclearance procedure for over thirty-five years.

32.     Covered jurisdictions must submit to this federal review process for "[a]ny change affecting voting, even though it appears to be minor or indirect, returns to a practice or procedure, ostensibly expands voting rights, or is designated to remove the elements that caused

objection by the Attorney General to a prior submitted change." 28 C.F.R. § 51.12.

33.    Voting changes subject to preclearance include, but are not limited to the list set out in 28 C.F.R. § 51.13:

    a.    Any change in qualifications or eligibility for voting.

    b.    Any change concerning registration, balloting and the counting of votes and any change concerning publicity for or assistance in registration or voting.

    c.    Any change with respect to the use of a language other than English in any aspect of the electoral process.

    d.    Any change in the boundaries of voting precincts or in the location of polling places.

    e.    Any change in the constituency of an official or the boundaries of a voting unit (e.g., through redistricting, annexation, deannexation, incorporation, reapportionment, changing to at-large elections from district elections, or changing to district elections from at-large elections).

    f.    Any change in the method of determining the outcome of an election (e.g., by requiring a majority vote for election or the use of a designated post or place system).

    g.    Any change affecting the eligibility of persons to become or remain candidates, to obtain a position on the ballot in primary or general elections, or to become or remain holders of elective offices.

    h.    Any change in the eligibility and qualification procedures for independent candidates.

    i.    Any change in the term of an elective office or an elected official or in the offices that are elective (e.g., by shortening the term of an office, changing from election to appointment or staggering the terms of offices).

    j.    Any change effecting the necessity of or methods for offering issues and propositions for approval by referendum.

k.      Any change affecting the right or ability of persons to participate in political campaigns which is affected by a jurisdiction subject to the requirement of §5.

34.     Each change is subject to a preclearance process, which the U.S. Attorney General has set out in thirty-nine subsections of excruciating detail in the Code of Federal Regulations. *See* 28 C.F.R. §§ 51.20 to 51.61, 51.65 to 51.67.

35. The §5 preclearance process is costly and burdensome.  In addition to the cost of the submission itself, proposed changes are subject to significant delays awaiting approval from the U.S. Attorney General.  This has resulted in delay and uncertainty in the conduct of state elections.  Examples of those burdens are set forth below.

### SB 1001

36.     On February 9, 2010, Arizona Governor Jan Brewer signed SB 1001 into law. The bill authorized a special election to be held on May 18, 2010, to allow the citizens of Arizona to vote on an early tax increase to avoid further cuts to education.  On February 22, 2010, the Arizona Attorney General's Office submitted this bill to the United States Department of Justice.  DOJ Case No. 2010-0537.  If DOJ took its full sixty days to review the submission, the election would not be cleared until April 22, less than a month before the election was to be held.  Arizona therefore asked for expedited consideration.  Despite the request for expedited consideration and the fact that holding a special election could in no way undermine the voting rights of minority voters, DOJ failed to notify Arizona that it would not interpose an objection to SB 1001 until April 12, 2010, a month and a half later.

### HB 2788

37.     On April 1, 2010 the Governor signed HB 2788 into law.  HB 2788 contained an emergency clause, which means, that under Arizona law, it was effective immediately upon the Governor's signature.  On April 6, to limit the time in which Arizona had a law that it could not enforce on the books, the Arizona Attorney General's Office sought expedited consideration. DOJ File No. 2010-1826.  Despite the request for expedited consideration, DOJ failed to notify

Arizona that it would not interpose an objection to HB 2788 until June 4, 2010—only one day before the sixty-day limit.

38.     The VRA's vast scope creates a burden for Arizona and its political subdivisions to ensure that a submission is made for each change that falls within the scope of the VRA.

39.     Arizona has been required to file dozens of preclearance submissions each year. *See* http://www.azag.gov/Preclearances/ (providing lists of recent years' submissions).  Upon information and belief, the State's political subdivisions make hundreds of such submissions each year.  In addition to seeking preclearance for SB 1205, Arizona will needlessly be required to submit additional electoral changes in the future for preclearance.

40.     Although the U.S. Attorney General rarely objects to proposed changes in voting practices of Arizona and its political subdivisions, the process imposes unnecessary and significant costs on government units of this State not only in terms of money and time, but also in terms of the federal government's intrusion on the sovereignty of state and local governments.

## UNEQUAL TREATMENT OF STATES

41.     The discrimination against Arizona, as opposed to treatment of other states, under the statute and its application, also shows that the statute and its application lack a rational basis and are unconstitutional.

42.     Nevada is an uncovered state.  In the 1972 election, 49.5% of Nevada's voting age residents voted.  (See http://uselectionatlas.org/RESULTS/).  Also, none of Nevada's current laws protecting non-English-speaking voters had been enacted.  (*See* Nev. Rev. Stat. § 293.2699 (added 2003); Nev. Rev. Stat. 293.296 (added 1973); Nev. Rev. Stat. 293C.282 (added 1997)).

43.     In the 1970 census of Nevada residents, 5.5% were classified as "persons of Spanish language," 4.1% were classified as "persons of Spanish origin or descent," and 0.1% were classified as "persons of Puerto Rican birth or parentage."[4]  The Nevada census did not record the number of "persons of Spanish surname," (*see id*.), but many of the "persons of

---

[4] *See* U.S. Department of Commerce, Bureau of the Census, 1970 Census of Population, Vol. I Characteristics of the Population, Pt. 4 Arizona, Table 60 Ethnic Characteristics by Size of Place: 1970 (Issued Feb. 1973), attached as Exhibit A.

Spanish origin or descent" and "persons of Puerto Rican birth or parentage" would have been included.

44.     Assuming that the percentage of Nevada's "persons of Spanish language" did not drop below 5% in the two-year period following the 1970 census, had Nevada been subject to the same "Spanish heritage" formula as Arizona, which included *both* "persons of Spanish language" *and* "persons of Spanish surname," Nevada would have been covered.

45.     Hawaii is another uncovered state.  In each of the last eight presidential elections (since 1980), the percentage of voting age persons who voted in Hawaii was below fifty percent and was lower than Arizona.  Likewise, in each of the last six presidential elections (since 1988), the percentage of voting age persons who voted in Nevada never exceeded that of Arizona by more than 0.8%.  Conversely, during the last eight presidential elections (since 1980), neither Alaska nor Louisiana has had voter turnouts of less than fifty percent.  Yet Alaska and Louisiana are covered jurisdictions in their entirety.[5]

46.     Though there are many states that are deemed "uncovered" by the 1975 VRA and its amendments, these uncovered states are no more or less likely than Arizona to deny limited-English proficient Hispanic voters the opportunity to participate in the electoral process on an equal basis with other members of the electorate.  Indeed, Arizona has not violated the 1975 VRA.  Hispanic citizens in Arizona, including those who are "limited English proficient" participate fully in the electoral process, register to vote, cast votes for representatives of their choice, have access to voting materials in English and in Spanish, and can mark ballots in English or in Spanish.  In short, Arizona meets it obligations under the Constitution by providing essential services so that Hispanic voters may exercise their right to vote.

## VI.   DECLARATORY JUDGMENT

### i.   General Assertions

47.     The preclearance requirements imposed on the State of Arizona and its political subdivision should be stricken as unconstitutional under the Tenth, Fourteenth, and Fifteenth Amendments.

---

[5] Determination of the Director of the Census Pursuant to § 4(b)(2) of the Voting Rights Act of 1965, 30 Fed. Reg. 9897 (1965) (Louisiana); Voting Rights Act Amendments of 1975, 40 Fed. Reg. 49422 (1975) (Alaska).

48.     Arizona and its political subdivisions are being punished for conditions that predated the enactment of the 1975 VRA.  Indeed, those conditions were remedied in 1974 when Arizona provided equal access to the electoral process for limited English Hispanic voters. Arizona's commitment to ensure that its Hispanic voters have proper opportunities to engage in the electoral process has been undiminished since 1974.  There is no justifiable reason for infringing on Arizona's sovereignty and imposing the extreme burden of preclearance procedures on Arizona when Arizona does not engage in discriminatory practices against Hispanic voters.

49.     In reauthorizing §5, Congress irrationally continued preclearance requirements on states even when the discriminatory conditions did not exist at the time of the enactment of the 1975 VRA or had ceased to exist since the adoption of the 1975 VRA.  There is no reason to require Arizona to be subject to preclearance requirements when it has not engaged in discriminatory practices against Hispanic voters for more than 35 years.

50.     Now, more than 35 years after the 1975 VRA was enacted, it is arbitrary and irrational for Congress to continue preclearance.  Section 5 should be struck down as unconstitutional, either on its face or as applied.

51.     It is unjust for Congress to rely on findings that did not exist in Arizona when the 1975 VRA was enacted and certainly have not existed for over 35 years.

### ii.   Facial Challenge to Overreach in the 2006 Reauthorization of the VRA

52.     This section incorporates paragraphs 1 through 51 by reference.

53.     As the Supreme Court has recently explained, §5 of the VRA suspends "all changes to state election law—however innocuous—until they have been precleared by federal authorities in Washington, D.C." *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 129 S. Ct. 2504, 2511 (2009) ("NAMUDNO").  Such heavy handed intrusion on state sovereignty exceeds Congress's authority under the Fourteenth and Fifteenth Amendments.

54.     Furthermore, as enforced, states are required to seek federal approval even for changes that provide greater voting access to racial or "language minorities" or, alternatively, federal approval is required even though the changes have and will have no impact on the right

of "language minorities to equally participate in the electoral process.  28 C.F.R. § 51.12. Section 5 of the VRA is not rationally related to the goal of the Fifteenth and Fourteenth Amendment and exceeds Congress's authority.

55.    "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const., amend. X. "Under our Constitution, the Federal Government is one of enumerated powers." *City of Boerne v. Flores*, 521 U.S. 507, 516 (1997).

56.    Therefore, the State asks this Court to declare §5 of the VRA unconstitutional and enjoin enforcement of it as spelled out in the prayer for relief.

### iii. Challenge to § 4 Formula of the VRA as Applied to Arizona

57.    This section incorporates paragraphs 1 through 56 by reference.

58.    In reauthorizing the VRA in 2006, Congress exceeded its authority under the Fourteenth and Fifteenth Amendments because it imposed current burdens on covered jurisdictions without a basis in current need, and thus Congress's action was not rationally related to enforcing the Fifteenth and Fourteenth Amendments.

59.    Even prior to the 1974 elections, Arizona had switched to a bilingual election system, which included ballots, voting machine forms, and voting machine instructions in both Spanish and English.[6]  In light of these facts, the use of 1972 as the bench mark made the statute irrelevant, and not related to any rational purpose.

60.    In 2006, Congress recognized that "significant progress" had been made in addressing the concerns that originally justified the VRA and cited "increased numbers of registered minority voters, minority voter turnout, and minority representation."[7]

61.    Neither the 1975 amendment nor the 2006 VRA supported including or maintaining Arizona as a covered jurisdiction.

62.    Because the amendments and re-authorization exceeded Congress's authority, the

---

[6] *See* Extension of the Voting Rights Act of 1965: Hearing Before the S. Subcomm. on Constitutional Rights of the Comm. on the Judiciary, 94th Cong. (April 30, 1975) (Testimony of Hon. Barry Goldwater, A U.S. Senator From the State of Arizona).

[7] *See* Fannie Lou Hamer, Rosa Parks, and Coretta Scott King Voting Rights Act Reauthorization and Amendments Act of 2006, H.R. 9, 109th Cong. § 2(b)(1) (2006).

State asks this Court to declare § 4(b) of the VRA unconstitutional and enjoin enforcement of it as spelled out in the prayer for relief.

### vi.   Facial Challenge to Unequal Treatment of States Under the VRA

63.   This section incorporates paragraphs 1 through 62 by reference.

64.   The VRA differentiates among the States in violation of the nation's tradition that all States enjoy equal sovereignty.

65.   Current data shows that covered jurisdictions are no more likely than other states to be accused of abridging the voting rights of minority voters.

66.   The lack of rationality in differentiating among the states constitutes a violation of the Fourteenth and Fifteenth Amendments.

67.   Because this differentiation can no longer be justified, the State asks this Court to declare §§ 4(b) and 5 of the VRA unconstitutional and enjoin enforcement of them as spelled out in the prayer for relief.

### v.   Challenge to Unequal Treatment of States as the VRA is applied to Arizona

68.   This section incorporates paragraphs 1 through 67 by reference.

69.   The 1975 VRA "language minority" coverage formula unconstitutionally differentiates between states by applying three different standards for "Spanish heritage" to three different groups of states.  For example, Arizona would not have been covered by the definition applied to New Jersey, New York, and Pennsylvania.  Similarly, Nevada would have been covered by the definition applied to Arizona.

70.   There is no rational relationship between these "language minority" formula differentiations among U.S. States and any constitutional delegation of power to the federal government.

71.   Because this differentiation has no rational basis, the State asks this Court to declare §§ 4(b) and 5 of the VRA unconstitutional and enjoin enforcement of them as spelled out in the prayer for relief.

# PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully request that:

A.     The Court declare that §§ 4(b) and 5 of the VRA exceed the power of Congress.

B.     The Court declare that §§ 4(b) and 5 of the VRA, both generally and particularly as applied by the U.S. Attorney General to the State of Arizona, unconstitutionally differentiate between states without sufficient justification;

C.     The Court permanently enjoin the Defendant from enforcing §§ 4(b) and 5 of the VRA.

D.     Alternatively, the preclearance requirements of §5 should not apply to the State of Arizona and its political subdivisions.

Dated this 25th day of August, 2011.

THOMAS C. HORNE
Arizona Attorney General

/s/ James E. Barton II

Eric J. Bistrow
Chief Deputy Attorney General
David R. Cole
Arizona Solicitor General
James E. Barton II
Assistant Attorney General
1275 West Washington Street
Phoenix, Arizona 85007-2926
Telephone: (602) 542-3333
Facsimile: (602) 542-8308
SolicitorGeneral@azag.gov

2283034