UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STATE OF ARIZONA,<br><br>      **Plaintiff,**<br><br>      v.<br><br>ERIC H. HOLDER, Jr., in his official capacity as Attorney General of the United States,<br><br>      **Defendant.** | Civil Action No. 11-1559 (JDB) |

## MEMORANDUM OPINION & ORDER

Section 5 of the Voting Rights Act ("the VRA" or "the Act"), 42 U.S.C. § 1973c, prohibits certain "covered" jurisdictions from implementing any change to state election practices or procedures unless and until the jurisdiction demonstrates to federal authorities that the change "neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race or color." 42 U.S.C. § 1973c(a). Section 4 of the VRA determines which jurisdictions are "covered" by Section 5. 42 U.S.C. § 1973b(b). In this case, Arizona has brought constitutional challenges to both Sections 4 and 5. Now before the Court is [11] Arizona's request to have those challenges adjudicated by a three-judge court. For the reasons given below, the Court will deny the motion.

Background

The Voting Rights Act was enacted in 1965 primarily to protect the rights of racial minorities. At that time, Section 4 provided that covered jurisdictions were those that (1) maintained a voting "test or device" on November 1, 1964; and (2) had registration or turnout

1

rates below fifty percent of the voting age population in November 1964.  1965 Act § 4(b), 79 Stat. at 438 (codified as amended at 42 U.S.C. § 1973b(b)).  In 1975, Congress amended the Voting Rights Act to protect "language minorities" in addition to racial minorities.  1975 Amendments §§ 203, 207, 89 Stat. at 401-02 (codified as amended at 42 U.S.C. §§ 1973b(f), 1973*l*(c)(3)).  Accordingly, Congress also amended Section 4 to provide that covered jurisdictions were those that had "maintained on November 1, 1972 any test or device, and with respect to which . . . less than 50 per centum of the citizens of voting age were registered on November 1, 1972, or that less than 50 per centum of such persons voted in the Presidential election of November 1972."  Id. § 202, 89 Stat. at 401 (codified at 42 U.S.C. § 1973b(b)).  The definition of "test or device" was amended to include "any practice or requirement by which any State or political subdivision provided any registration or voting [materials] only in the English language, where . . . more than five per centum of the citizens of voting age residing in such State or political subdivision are members of a single language minority."  Id. § 203, 89 Stat at 401-02.  This version of Section 4's coverage formula is still in place today.  42 U.S.C. § 1973b(b), (c), (f)(3).

Arizona, a state where more than five percent of the citizens of voting age are defined as "members of a single language minority," implemented bilingual voting in 1974.  Am. Compl. ¶ 18.  Nonetheless, because Section 4 looks to whether a state had implemented bilingual voting by 1972, Arizona is a covered jurisdiction.  Hence, the state and its political subdivisions must comply with Section 5.  On August 30, 2011, Arizona filed this suit in an attempt to end that obligation to comply with Section 5.  In its amended complaint, Arizona alleges that (1) on its face, Section 5 unconstitutionally exceeds Congress's enforcement authority under the

Fourteenth and Fifteenth Amendments because it is not even rationally related to the problem of discrimination in voting, Am. Compl. ¶¶ 63-67; (2) on their face and as applied to Arizona, Sections 4(b) and 5 exceed Congress's enforcement authority under the Fourteenth and Fifteenth Amendments because they irrationally discriminate between states, id. ¶¶ 74-82; and (3) as applied to Arizona, Section 4 exceeds Congress's enforcement authority under the Fourteenth and Fifteenth Amendments because the 1972 benchmark is "not connected to any rational purpose," id. ¶¶ 68-73.

If these challenges fail, Arizona requests in the alternative that it be allowed to "bail out" of Section 5 coverage. Id. 83-89. A covered jurisdiction can avoid the requirements of Section 5 if a court or the Attorney General grants it "bailout" pursuant to Section 4(a) of the Voting Rights Act. See 42 U.S.C. § 1973b(a); see also Nw. Austin Mun. Utility Dist. No. One v. Holder, 557 U.S. 193, 129 S. Ct. 2504, 2516 (2009). In order to successfully "bail out" of the requirements imposed by Section 5, a jurisdiction must obtain a declaratory judgment from a three-judge court confirming that for the previous ten years the jurisdiction and its political subdivisions have not used a forbidden voting test, have not been subject to any valid objections under Section 5, and have not been assigned federal observer election coverage. 42 U.S.C. §1973b(a)(1)(A)-(E). The state and its political subdivisions must also show that they have "eliminated voting procedures . . . which inhibit or dilute equal access to the electoral process" and have engaged in "constructive efforts" to expand the ability to vote. Id. § 1973b(a)(1)(F). Arizona concedes that it cannot meet all of the statutory requirements for bailout because the Attorney General has interposed objections to changes made by Arizona and its political subdivisions within the last ten years. Am. Comp. ¶¶ 54-55. Additionally, Arizona's complaint

implies, though it does not directly state, that federal observers have been sent to monitor elections in Arizona in the last ten years.  Am. Compl. ¶ 51.  Arizona contends, however, that it is unconstitutional to make bailout dependent on discretionary acts of the Attorney General.  Hence, it asks this Court to "declare the particularized requirements set out in 42 U.S.C. § 1973b(a)(1)(A)-(F) unconstitutional" and to "declare that, pursuant to 42 U.S.C. § 1973b(a)(1), the preclearance requirements of § 5 no longer apply to the State of Arizona and its political subdivisions."  Am. Compl. ¶ 89; Prayer for Relief D.

## Discussion

Several types of voting rights suits are heard by three-judge courts.  First, the Voting Rights Act provides that suits brought "under" Section 5 "shall be heard and determined by a court of three judges . . . and any appeal shall lie to the Supreme Court."  42 U.S.C. § 1973c(a).  Declaratory judgment suits by jurisdictions seeking preclearance of election changes are the most common type of suit brought "under" Section 5.  In addition, the Supreme Court has held that two implied causes of action can also be brought "under" Section 5 for purposes of section 1973c(a)'s three-judge court requirement.  First, "the Attorney General may bring an injunctive action to prohibit the enforcement of a new regulation because of the State's failure to obtain approval under § 5."  Allen v. State Bd. of Elections, 393 U.S. 544, 561 (1969).  Second, a private citizen "may bring a suit for declaratory judgment and injunctive relief, claiming that a state requirement is covered by § 5, but has not been subjected to the required federal scrutiny."  Id.; see also id. at 563.  The Allen Court noted that sound policy in addition to the statutory text supported three-judge court adjudication of such claims:

> [i]n drafting § 5, Congress apparently concluded that if the governing authorities
> of a State differ with the Attorney General of the United States concerning the

> purpose or effect of a change in voting procedures, it is inappropriate to have that difference resolved by a single district judge. The clash between federal and state power and the potential disruption to state government are apparent. There is no less a clash and potential for disruption when the disagreement concerns whether a state enactment is subject to § 5. The result of both suits can be an injunction prohibiting the State from enforcing its election laws. Although a suit brought by the individual citizen may not involve the same federal-state confrontation, the potential for disruption of state election procedures remains.

Allen, 393 U.S. at 562-63. Finally, in addition to these three types of "arising under" suits heard by three-judge courts, Section 4(a) specifies that bailout requests are heard by a three-judge court: "An action pursuant to this subsection shall be heard and determined by a court of three judges . . . and any appeal shall lie to the Supreme Court." 42 U.S.C. § 1973b(a)(5).

"[C]ongressional enactments providing for the convening of three-judge courts must be strictly construed." Allen, 393 U.S. at 361 (citing Phillips v. United States, 312 U.S. 246 (1941)). Nonetheless, as Arizona correctly points out, if any part of this case should be before a three-judge court, the three-judge court would be able to hear the whole case under a theory of pendant jurisdiction. See Rome v. United States, 472 F. Supp. 221, 236 (D.D.C. 1979).

Arizona advances two alternative theories for why its challenge should be heard by a three-judge court. First, Arizona argues that its constitutional challenge to Section 5 involves an even stronger "clash between federal and state power" than normal preclearance suits do, so there is all the more reason to have a three-judge court hear those challenges. The Court considered and rejected an identical argument LaRoque v. Holder, No. 10-561, 2010 WL 3719928, at *2-3 (D.D.C. May 12, 2010). The Court observed that the argument was "not without some merit," but that "Congress's federalism concerns do not apply to this challenge to Section 5's constitutionality." Id. Congress was concerned with minimizing clashes between federal courts and state governments, see Allen, 393 U.S. at 562-63, but invalidating Section 5

on constitutional grounds "would curtail federal, not state, power." LaRoque, 2010 WL 3719928, at *3.  In this case, as in LaRoque, upholding Section 5 would not invalidate or disrupt the state's election procedures; Arizona has not asked the Court to preclear any specific election changes or procedures.  See id.  Hence, in this case as in LaRoque, "a decision affirming Section 5's constitutionality would preserve the very balance between federal and state power that Congress struck through enactment of that provision." Id.

Arizona argues in the alternative that its bailout request must be heard by a three judge court, which would then also hear the constitutional challenges.  Arizona notes that Northwest Austin was heard by a three-judge court for precisely this reason.  As the government points out, however, the bailout request in this case is different than the bailout request in Northwest Austin.  There, the plaintiff contended that it qualified for bailout under the terms of the bailout statute; here, plaintiff concedes that it does not qualify for bailout under Section 4(a), but rather argues that the provisions that disqualify it are unconstitutional.  In other words, this Court must adjudicate the constitutional challenge to the bailout standard and rule in Arizona's favor before it can adjudicate the statutory bailout request.  The government argues that this is merely a constitutional challenge thinly disguised as a bailout request, and that, like Arizona's other stand-alone constitutional challenges, it should be adjudicated by a single-judge court.  Arizona replies that it may eventually be litigating a straightforward statutory bailout challenge that would normally be before a three-judge court, and that there is no reason to force it to bring that case separately from its constitutional challenge to the bailout procedure.

Whether a three-judge court should be convened to hear a case if it may never be able to reach the only claim that merits a three-judge court is a difficult question, and the Court has

found no cases addressing it.  The Court need not answer that difficult question, however, because it concludes that even if Arizona succeeds on its constitutional claim here, it will not result in the type of straightforward bailout request that is heard by a three-judge court.  If Arizona's constitutional challenge succeeds, the Court would not simply proceed to apply the bailout statute as currently written.  Nor would it surgically excise the bailout requirements that Arizona has not met and apply the remaining criteria.  Instead, Arizona has requested that the Court declare <u>all</u> of the requirements in § 1973b(a)(1)(A)-(F) unconstitutional and then grant it bailout pursuant to § 1973b(a)(1).  But if all of those "particularized requirements" are struck, nothing remains of subsection (a)(1), and this Court would have to invent an entirely new bailout standard.[1]  It is true that 42 U.S.C. § 1973b(a)(5) requires three-judge courts for actions "pursuant to this subsection," but inventing and applying a bailout standard would not be "[a]n action[ ] pursuant to this subsection."  Plaintiffs' "statutory" bailout challenge is more like their sweeping constitutional challenges than a traditional statutory bailout action.  Hence, 42 U.S.C. § 1973b(a)(5) does not apply, and there is no statutory basis for having a three-judge court adjudicate this claim.  <u>See</u> <u>Allen</u>, 393 U.S. at 361 (statutes providing for three-judge courts "must be strictly construed").

Unlike the <u>LaRoque</u> plaintiffs, Arizona has not asked this Court to convene a three-judge Court voluntarily.  <u>See</u> 2010 WL 3719928, at *3.  Even if this Court had the authority to do so, it would decline to exercise that authority for the reasons given in the opinion in <u>LaRoque</u>.  <u>Id.</u>

---

[1] Arguably, 42 U.S.C. § 1973b(a)(2) - (4) could provide a standard for adjudicating bailout requests if § 1973b(a)(1)(A)-(F) are struck down.  But applying only subsections (2) - (4) would make little sense without the other provisions, and in any event, Arizona has only asked the Court to grant bailout under § 1973b(a)(1).

Accordingly, it is hereby **ORDERED** that [11] Arizona's application for a three-judge court is **DENIED**.

/s/
JOHN D. BATES
United States District Judge

Dated: January 11, 2012